Filed 8/21/24  In re Andrew T. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re ANDREW T., a Person Coming Under the Juvenile Court Law. | B333081 (Los Angeles County Super. Ct. No. 21CCJP01397) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. EVELIN A. et al. Defendants and Appellants. | |

APPEAL from orders of the Superior Court of Los Angeles County, Pete R. Navarro, Judge.  Affirmed in part; vacated in part and remanded.

Jesse McGowan, under appointment by the Court of Appeal, for Defendant and Appellant Evelin A.

Shaylah Padgett-Weibel, under appointment by the Court of Appeal, for Defendant and Appellant Anthony T.

Dawyn R. Harrison, County Counsel, and Kimberly Roura, Deputy County Counsel, for Plaintiff and Respondent.

\* \* \* \* \* \*

Evelin A. (mother) and Anthony T. (father) (collectively parents) appeal from the juvenile court's orders denying their petitions filed pursuant to Welfare and Institutions Code section 388.[1]  The parents do not challenge the merits of the orders; instead they argue the juvenile court erred in its implicit finding that the Los Angeles County Department of Children and Family Services (DCFS) fulfilled its duty of inquiry under the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.; Welf. & Inst. Code, § 224 et seq.) (ICWA).  DCFS concedes the parents' challenges have merit, and the parties have filed a joint application and stipulation for conditional affirmance and remand to the superior court.  As explained below, we decline to grant the conditional affirmance and remand.  Instead we find the appropriate remedy is to affirm the court's orders denying the parents' section 388 petitions, and to vacate the court's implied finding of ICWA compliance and remand.

## COMBINED FACTUAL AND PROCEDURAL HISTORY

Mother is the mother of three children: twins, Abraham and Benjamin (born May 2013), and their younger half sibling, Andrew (born November 2020).  Father is the presumed father of

---

[1]     All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

the youngest child, Andrew.  Carlos H. is the presumed father of the twins.  This appeal pertains only to Andrew.

**Initial referral and removal**

On or about March 19, 2021, DCFS received an immediate response referral alleging physical abuse of four-month-old Andrew by father.  Andrew was born prematurely at 33 weeks and diagnosed with Down syndrome.

The reporting party stated mother brought Andrew to the emergency room after father tripped and fell while holding Andrew, causing Andrew to sustain a head injury.  Mother reported the injury occurred on March 17, 2021, at approximately 3:00 a.m., and Andrew arrived at the emergency room on March 18, 2021, at approximately 5:45 p.m.  Mother explained father was carrying Andrew in his arms while walking.  Father's foot became stuck in a floor swing, prompting father to fall forward with Andrew still in his arms.  Andrew cried for approximately 30 minutes before stopping.  As Andrew was due to see his pediatrician for his four-month checkup, the parents decided not to go to the emergency room.  Andrew's pediatrician was concerned about erythema along the right side of Andrew's head along with swelling, so the pediatrician sent them to the emergency room.[2]

The emergency room doctor was concerned there had been blunt force trauma.  The history of Andrew falling in father's arms was inconsistent with Andrew's injuries.  The doctor was also concerned about past injury, as the symptoms suggested

---

[2]     Erythema is "abnormal redness of the skin due to capillary congestion."  (Merriam-Webster.com Dict. (2024) <https:// www.merriam-webster.com/dictionary/erythema> [as of August 21, 2024], archived at <https://perma.cc/ULT5-K2FB>.)

they went back a week, prior to a previous hospitalization. The symptoms were growing head size and emesis. Andrew had been hospitalized from March 13 to 15, 2021, for repeated vomiting. Mother brought Andrew to the hospital on the evening of March 12, 2021, reporting he had become fussier about one and a half weeks earlier, and the prior day he had an episode of projectile vomiting. Mother believed Andrew's first vomit may have contained a small amount of blood. Andrew had two additional episodes of projectile vomiting.

At the time of his March 18, 2021 admission, a CT scan showed Andrew had a skull fracture and hemorrhages. A bone survey showed a horizontal linear fracture of the right parietal bone. He also suffered from an overlying scalp hematoma,[3] large bilateral, mixed-density, subdural hemorrhages[4] causing diastasis[5] of sutures and skull fracture, and posterior fossa

---

[3] "A hematoma is an abnormal collection of blood outside of a blood vessel. . . . [¶] . . . [¶] . . . Scalp hematomas occur on the outside of the skull . . . ." (Wedro & Caputy, *Hematoma*, MedicineNet.com (Nov. 7, 2023) <https://www.medicinenet.com/hematoma/article.htm>, boldface omitted [as of Aug. 21, 2024], archived at <https://perma.cc/A9TL-JRGT>.)

[4] "A subdural hemorrhage . . . is a kind of intracranial hemorrhage, which is the bleeding in the area between the brain and the skull." (*What Is a Subdural Hemorrhage?*, RWJ Barnabas Health (2024) <https://www.rwjbh.org/treatment-care/neuroscience/neurology/conditions/subdural-hemorrhage/> [as of Aug. 21, 2024], archived at <https://perma.cc/J62F-B9JM>.)

[5] "Diastasis" is "an abnormal separation of parts normally joined together." (Merriam-Webster.com (2024) <https://www.merriam-webster.com/medical/diastasis> [as of Aug. 21, 2024], archived at <https://perma.cc/ULJ2-9AAL>.)

4

hemorrhage.[6]  He required intensive care evaluation and surgery. Andrew was transported from the operating room to the pediatric intensive care unit with a burr hole for drainage of subdural fluid collection (right head), and placement of a subdural to peritoneal shunt (right head).  It was unknown when Andrew would be discharged, as he needed to be evaluated for the possibility his injuries were the result of nonaccidental trauma.

A DCFS social worker interviewed mother at the hospital following Andrew's surgery.  Mother reported the child appeared to be doing well after surgery.  The parents both worked as security guards; mother worked the graveyard shift so father could be home with Andrew while she worked.  The parents had been together for two years and were married in June 2020. Benjamin and Abraham were then living with maternal grandmother.

Mother reported father contacted her while she was working the graveyard shift and told her he had tripped over the swing they recently assembled and fell with the baby in his arms. Mother instructed father to keep the child awake, and they did not take the child to the emergency room right away because he was consolable.  The social worker asked mother about the hemorrhages and inconsistent timeline with the injuries.  Mother could think of no other incidents that might explain the child's injuries.  Mother denied ever seeing suspicious marks or bruising.

---

[6]     "The posterior fossa is a small space in the skull containing the brainstem and cerebellum."  (Fischer & Das, *Cerebellar Hematoma* (June 17, 2023) National Library of Medicine <https://www.ncbi.nlm.nih.gov/books/NBK541076> [as of Aug. 21, 2024], archived at <https://perma.cc/4LMU-Q4PJ>.)

Child abuse specialist Dr. Corey Rood reported the neurosurgeon who completed Andrew's procedure concluded the child had bilateral hemorrhaging that was not new. The blood appeared to be older. Vomiting, fatigue, and missed feedings were reported the previous week, which was likely when the injury occurred.

Dr. Rood attempted to get a clear statement from father about how he fell and landed with the child in his arms. Dr. Rood was unable to understand the explanation offered. Father was unsure if the child hit the wall or the tile floor. Regardless of father's story, a fall could possibly result in a fractured skull, but it did not explain the hemorrhaging. Bleeds that large were consistent with shaking or blunt force trauma. Because the bleeds were on both sides of the child's head, and because of the large size of the bleeds, the injuries were likely inflicted trauma rather than accidental.

Father's history with DCFS included a referral in February 2017 for emotional abuse of his children Michelle, then age 13; Ethan, then age 10; and Liam, then age 3. There were allegations of a physical altercation between father and the mother of those children, Cynthia A., resulting in a 911 call. Michelle and Ethan reported their mother and father assaulted each other, but later retracted their story. Law enforcement determined that father was the aggressor, and he was arrested for cohabitant abuse. Cynthia said there were 10 previous unreported incidents of domestic violence.

On March 23, 2021, a DCFS social worker filed an application and declaration in support of authorization for removal of Andrew from his parents, as well as a request for expedited removal to obtain a hospital hold that would prevent Andrew's immediate release to his parents. The juvenile court

granted both the expedited removal order and the protective custody warrant for Andrew.

**Section 300 petition and detention**

On March 25, 2021, DCFS filed a juvenile dependency petition alleging Andrew was described by section 300, subdivisions (a), (b)(1), and (e), based on the March 19, 2021 medical examination, which found Andrew was suffering from a right parietal skull fracture, overlying scalp hematoma, large bilateral, mixed-density, subdural hemorrhages causing diastasis of sutures and skull fracture, and a posterior fossa hemorrhage.[7] In addition, between March 14 and March 18, 2021, Andrew's head circumference had swelled from the 42d percentile to the 99th percentile compared to other babies his age. Andrew suffered large bleeds to both sides of his head, and his injuries required surgical intervention, including a burr hole for draining subdural fluid collection and placement of a subdural to peritoneal shunt. The petition indicated the parents' explanation of the manner in which Andrew sustained his injuries was inconsistent with the injuries, which were consistent with nonaccidental or inflicted trauma.

DCFS relied on section 355.1, subdivision (a) to assert a rebuttable presumption existed for finding Andrew to be a person described by subdivision (a), (b), or (d) of section 300. Andrew was detained at Miller Children's Hospital in Long Beach.

On March 30, 2021, the juvenile court found DCFS had set forth a prima facie case that Andrew was described under section 300 and ordered him detained from his parents, who were

---

[7]     The petition also included Andrew's twin half brothers, Abraham and Benjamin. Abraham and Benjamin are not parties to the current appeal.

7

ordered to have monitored visits with Andrew. DCFS was to inform the parents of Andrew's medical condition and followup appointments. Mother would be allowed to be present during Andrew's medical examinations. The court ordered appropriate case plan referrals to be provided to the parents.

**Reports**

DCFS filed a jurisdiction/disposition report in June 2021. Mother and father had not made themselves available for interviews.

On April 1, 2021, Andrew was released from the hospital to his first medically trained foster home. Thereafter the first foster caregiver asked DCFS to place Andrew in a new placement because she felt unable to meet Andrew's significant needs. On April 15, 2021, Andrew was placed into a new medically trained foster home with Michelle N. Andrew was categorized as needing the highest level of care available, including physical therapy, occupational therapy, cardiology, neurology, the regional center, ongoing monitoring, and followup MRI's. In addition, Andrew required followup appointments at the neurosurgery clinic and gastrointestinal clinic.

On May 25, 2021, a DCFS social worker interviewed Andrew's half brothers. When asked if he was safe with mother, Abraham shook his head. When asked why he was not safe, Abraham stared into the distance and did not provide an answer. When the social worker asked Benjamin if he was safe with mother, Benjamin shook his head. When asked why, Benjamin, too, did not answer. When asked if Benjamin was scared of anyone at mother's home, Benjamin nodded and said, "Anthony" (father).

On June 1, 2021, the social worker was able to observe Andrew's surgical scar, which extended from his head to his

8

chest. Dr. Rood later explained a shunt was necessary because Andrew's body might not have been able to absorb all the fluid buildup on its own. The amount of fluid in Andrew's head in March 2021 was so great that not one piece of his skull touched another piece of his skull. If left untreated there would have been significant impact to Andrew's motor development and other development. Andrew also had fluid buildup along his spine. Dr. Rood continued to opine that Andrew's injuries were consistent with inflicted trauma including abusive head trauma. Dr. Rood suggested if Andrew were returned to the caregiver(s) who inflicted these injuries, he would be at increased risk of further injury and even death.

DCFS recommended no reunification services to the parents pursuant to section 361.5, subdivision (b)(5), and requested a section 366.26 hearing for Andrew. Andrew's caregiver wanted Andrew to remain permanently with her if reunification with the parents failed.

The parents began visiting Andrew in July 2021. In August 2021, Andrew's caregiver began supervising the parental visits. Mother held and cuddled Andrew during the visits. The caregiver suggested more interaction between them and offered ideas of different techniques, but mother became upset and did not take the caregiver's suggestions. Mother would occasionally become upset and rude to the caregiver.

Mother started attending weekly therapy beginning on August 25, 2021.

**Adjudication**

The contested adjudication hearing was held on October 20, 2021. Father was present with counsel. Mother's exhibits, a progress letter regarding her individual therapy and DCFS service logs were admitted into evidence. Father's exhibits

included a letter from expert Dr. Grogan and medical records from Cranial Technologies. The exhibits also included a letter from expert Dr. Rood.

Following argument, the juvenile court took the matter under submission and set November 4, 2021, to deliver its ruling. Pursuant to Evidence Code section 730, the court appointed Dr. Ronald Banks to examine father, mother and Andrew and submit an evaluation report on or before November 24, 2021.

On November 5, 2021, the matter was called for the court's ruling on adjudication. Father was present with counsel via Webex. The court observed that no one was able to offer an explanation of Andrew's injuries other than the fall father described. Both the expert for DCFS and the parents' expert were in agreement that the fall was unlikely to have caused all of the injuries to Andrew. The court found it significant that Dr. Rood actually treated Andrew, while Dr. Grogan was only a consulting expert. The court found circumstantial evidence provided a preponderance of evidence suggesting that Andrew's injuries were nonaccidental. Although the identity of the person who harmed Andrew was not known, sufficient evidence indicated the parents reasonably should have known of Andrew's nonaccidental injuries.

The juvenile court amended the allegations to conform to its findings and sustained counts a-1, b-1, b-2 and e-2 as amended. The court found Andrew was a child described by section 300, subdivisions (a), (b), and (e).

**Evidence Code section 730 evaluation**

Dr. Banks, the appointed evaluator, prepared an evaluation of father on November 6, 2021, and an evaluation of mother on December 6, 2021. Dr. Banks was unable to answer the court's question regarding the relationship between the parents and

10

Andrew because Dr. Banks did not observe any interaction among them.

Dr. Banks reported his testing was inconclusive as to father because father significantly underreported, meaning "[h]e presented himself in an extremely positive light by denying any minor faults and shortcomings that most people acknowledge." Therefore, father's testing was uninterpretable. Dr. Banks noted inconsistency in that father denied living in the home with Andrew when Andrew's injury occurred, although the record revealed otherwise. Dr. Banks noted he would diagnose father with unspecified anxiety disorder.

Dr. Banks found mother's psychological testing revealed symptoms of depression and anxiety as well as low frustration tolerance, a tendency not to cope well with stress, feelings of insecurity, and self-disparaging behavior. Mother also appeared to experience difficulties in memory and concentration, dysfunctional thinking in the form of ideas of persecution, and interpersonal difficulties related to cynicism. All of these raised concerns about the possibility of reabuse, especially of a child with developmental disabilities such as Andrew. Mother's symptoms raised concerns about her ability to protect her children. Dr. Banks recommended consideration of antidepressant medication and a neuropsychological evaluation for mother. He diagnosed her with unspecified depressive and anxiety disorders and recommended ruling out PTSD.

Dr. Banks concluded, "At this time reunification is not recommended. Court documents indicate that both parents' explanation of events related to the current matter are inconsistent. There was inconsistency during [father's] evaluation as well." Dr. Banks also noted, "children with

11

developmental disabilities are at greater risk of child abuse and neglect than those without disabilities."

On December 19, 2021, mother's counsel obtained a letter from Dr. Banks, which stated he could not comment on the quality of the parent-child attachment between Andrew and the parents without observing them interacting with each other. Dr. Banks's assessment as to whether participation by the parents in recommended services would more likely than not reduce the risk of reabuse was a "cautious yes." Dr. Banks recommended continued therapy for both parents and a psychiatric consultation and neuropsychological evaluation for mother.

**Disposition hearing**

The disposition hearing took place on January 25, 2022, February 4, 2022, and February 16, 2022.

The court found by clear and convincing evidence that reunification services should not be provided to the parents because it would not benefit the child to offer reunification services. The court set the matter for a section 366.26 permanency planning hearing.[8]

**Postdisposition proceedings**

On March 7, 2022, DCFS filed a JV-180 request to change court order asking that the juvenile court limit the parents' visits

---

[8] On February 16, 2022, father filed a notice of intent to file writ petition to challenge the order setting the section 366.26 permanency planning hearing. On August 29, 2022, the court granted counsel's request for a 15-day extension to allow father to file his own petition. No petition was filed, and the writ was deemed nonoperative on September 21, 2022. The juvenile court continued the section 366.26 hearing a few times due to the stay of section 366.26 proceedings during the pendency of the writ.

12

with Andrew to virtual visits. Andrew's doctor had recommended reduction of travel except for needed therapies or medical appointments, and the parents had been acting inappropriately during in-person visits.

At a nonappearance progress hearing on March 22, 2022, the court suspended in-person visits between the parents and Andrew and ordered DCFS to meet with the parents to try to develop an alternate visitation method that did not require Andrew to be in the car for a lengthy period.

On April 13, 2022, DCFS filed a last minute information for the court describing an incident in which the parents prevented scheduled surgery for Andrew to remove the shunt. The parents arrived at the hospital on the day of the surgery and withdrew their consent to the surgery. The parents had previously consented to the surgery and called it off at the last minute. The caregiver reported she was in the waiting room when the nurse came out to tell her the parents had just withdrawn their consent and left the hospital. The hospital staff was frustrated because a lot of money and time was wasted. The social worker spoke with a nurse who said the surgery could wait, but no more than six months or else the shunt would calcify in Andrew's brain.

DCFS asked the court to suspend all visitation and virtual visitation between the parents and Andrew and recommended limiting the parents' medical decisionmaking rights and granting those rights to the caregiver.

On April 29, 2022, after a hearing, the juvenile court denied DCFS's request to suspend the parents' visitation and limit their medical decisionmaking authority. The court ordered in-person visits continue for two hours per visit, twice weekly at a location a reasonable distance from the foster home. The court authorized Andrew's shunt removal surgery.

**The parents' section 388 petitions**

On August 15, 2022, mother filed a section 388 petition asking to change the court's orders bypassing reunification services to her and scheduling a section 366.26 hearing as to Andrew. Mother requested the court grant her reunification services and/or liberalize mother's visits to include overnight or unmonitored visitation with Andrew.

On September 9, 2022, DCFS filed an interim review report recommending the juvenile court deny mother's petition.

On October 13, 2022, the juvenile court ordered a hearing on mother's section 388 petition.

On November 23, 2022, the day set for hearing on mother's section 388 petition, father filed a similar petition, claiming completion of the same parenting programs mother completed and asserted consistent quality visits with Andrew. Father claimed Andrew's best interests would be served because granting reunification services would strengthen the bond between Andrew and the parents and allow the parents to reunify with Andrew.

DCFS recommended both petitions be denied.

The hearings were continued, eventually commencing on January 9, 2023, and continuing on January 24, 2023, and February 1, 2023.

The court granted the parents' applications for relief and took the section 366.26 hearing off calendar. The court noted it was doing so over the objection of the child's counsel and DCFS.

Andrew filed his notice of appeal through his guardian ad litem and trial attorney on February 8, 2023. DCFS filed its notice of appeal on March 6, 2023. On May 8, 2024, this court reversed the juvenile court's order granting the parents' section

14

388 request for reunification services. (*In re Andrew T.* (May 8, 2024, B327021) [nonpub. opn.].)

**Section 388 petitions filed in July 2023**

In July 2023, mother and father each filed a new section 388 petition asking the juvenile court to return Andrew to their care. On September 7, 2023, the juvenile court conducted an evidentiary hearing on the petitions. Based on the documentary evidence the juvenile court denied the petitions, but extended the reunification period and scheduled the next status review hearing for March 7, 2024. The juvenile court did not address ICWA.

Mother filed a notice of appeal from the order denying her section 388 petition on November 6, 2023. Father filed a similar notice of appeal on November 15, 2023.

**Facts concerning ICWA inquiry**

At the March 2021 detention hearing, both parents denied having Indian ancestry. The juvenile court found ICWA did not apply.

During the dependency investigation, DCFS came into contact with the following relatives: maternal grandmother Rosa A., who had been caring for the twins at the time the case began and later supervised the parents' visitation with Andrew; maternal aunt Andrea A., whose home had been assessed for relative placement; maternal grandfather Gustavo A., who lived with maternal grandmother; and maternal uncle Diego A., who lived with maternal grandmother. DCFS also had the phone number for paternal aunt Jessica H.

The record does not show DCFS inquired into possible Indian ancestry with any of these extended family members.

15

**Postappeal rulings**

On March 29, 2024, the juvenile court terminated reunification services and scheduled a new section 366.26 hearing. The parents sought writ review but the petitions were dismissed. (*E.A. v. Superior Court* (May 22, 2024, B336378) [nonoperative writ].)

## DISCUSSION

The parents argue DCFS did not comply with its initial duty of inquiry under ICWA. DCFS acknowledges the record does not reflect DCFS inquired of any available extended family members regarding ICWA status. While the parents' appeals challenge only the juvenile court's denial of their section 388 petitions, we construe their appeals as challenging both the court's express finding in the detention order that ICWA does not apply as well as the court's implicit finding in subsequent proceedings that ICWA is still not applicable. (*In re Ricky R.* (2022) 82 Cal.App.5th 671, 683 [erroneous ICWA finding implicitly incorporated into later orders].)

All parties agree DCFS did not discharge its initial duty of inquiry under ICWA. Accordingly, the parties have sought a stipulation for conditional affirmance that we find inappropriate here. Instead, for the reasons set forth below, we affirm the juvenile court's denial of the parents' section 388 petitions and vacate the court's finding that Andrew is not an Indian child under ICWA.

## I.     Applicable law and standard of review

Under ICWA and corresponding California statutes (§§ 224-224.6), a juvenile court and DCFS have duties aimed at assessing whether a child in a dependency action is an "Indian child" (§§ 224.2, 224.3). An "Indian child" is a child who (1) is "a

16

member of an Indian tribe," or (2) "is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe."  (25 U.S.C. § 1903(4); see Welf. & Inst. Code, § 224.1, subd. (a) [adopting federal law definition].)

DCFS and the juvenile court have three distinct duties under ICWA.  (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1052.)  The initial "duty" is "to inquire whether a child [is] an Indian child." (§ 224.2, subds. (a) & (b).) DCFS discharges this duty by asking family members "whether the child is, or may be, an Indian child."  (*Id.*, subd. (b).)  This includes inquiring of not only the child's parents, but also others, including but not limited to, "extended family members."  (*Ibid.*)  The juvenile court is also required, "[a]t the first appearance" in a dependency case, to "ask each participant present" whether the participant knows or has "reason to know the child is an Indian child."  (*Id.*, subd. (c).)

The second duty is triggered if DCFS or the court has "reason to believe that an Indian child is involved" in the proceeding.  (§ 224.2, subd. (e).)  Once triggered, DCFS and the court must "make further inquiry regarding the possible Indian status of the child."  (*Ibid.*)  The third duty is the duty to notify the relevant Indian tribes if DCFS or the court "knows or has reason to know . . . that an Indian child is involved" based on the inquiries performed under the second duty.  (§ 224.3, subd. (a).)

In assessing whether ICWA has been violated, we review any questions of law de novo, but review the court's ICWA findings for substantial evidence.  (*In re Rebecca R.* (2006) 143 Cal.App.4th 1426, 1430; *Dwayne P. v. Superior Court* (2002) 103 Cal.App.4th 247, 254.)

## II.    Analysis

The parties in this matter agree DCFS and the juvenile court did not comply with the initial duty of inquiry under ICWA.

We concur in this assessment. Although mother and father denied Indian heritage, it is undisputed that DCFS did not ask the extended family members it contacted or knew of about Andrew's potential status as an Indian child. Consequently, substantial evidence does not support the juvenile court's finding—explicit in the detention order and implied in subsequent orders—that Andrew is not an Indian child. The court's conclusion necessarily contains an implied finding that DCFS complied with its initial duty of inquiry under ICWA. (*In re Y.M.* (2022) 82 Cal.App.5th 901, 909.) It did not do so.

Courts of Appeal have provided different remedies as to how to handle situations when an appellate court determines, prior to termination of parental rights, that the ICWA duty of initial inquiry has not been satisfied. (See, e.g., *D.S. v. Superior Court* (2023) 88 Cal.App.5th 383, 387-389, 391-392 [construing appeal from section 388 petition as a writ petition and evaluating the merits of ICWA compliance]; *In re T.R.* (2023) 87 Cal.App.5th 1140, 1154 [affirming juvenile court orders in their entirety on the rationale that the issue of ICWA compliance remains before the juvenile court and any deficiencies may be corrected]; *In re Baby Girl M.* (2022) 83 Cal.App.5th 635, 638-639 & fn. 2 [dismissing appeal where all that the court of appeal could order in resolving the appeal was for DCFS and the juvenile court to fulfill their inquiry and notice obligations, which they were already doing]; *In re Dominick D.* (2022) 82 Cal.App.5th 560, 563-564, 567-568 [affirming juvenile court's jurisdictional and dispositional findings and vacating the court's finding that ICWA does not apply].)

Since neither parent challenges the merits of the juvenile court's decision, we elect to affirm the juvenile court's denial of the parents' section 388 petitions. However, because all parties

agree DCFS and the juvenile court did not comply with the initial duty of inquiry under ICWA, we vacate the juvenile court's determination that ICWA is not applicable and remand the matter for DCFS to continue to comply with that duty.

## DISPOSITION

The juvenile court's orders denying mother's and father's section 388 petitions are affirmed. The juvenile court's implicit finding that Andrew is not an Indian child is vacated, and the matter is remanded for further proceedings in which (1) DCFS shall make reasonable efforts to inquire of all known and available family members whether Andrew is or may be an Indian child; (2) DCFS shall document these efforts to the juvenile court; (3) the juvenile court shall make a finding regarding ICWA's applicability; and (4) depending on the court's finding, the court and DCFS shall proceed in accordance with sections 224.2 and 224.4.

_____
CHAVEZ, J.

We concur:

_____
ASHMANN-GERST, Acting P. J.

_____
HOFFSTADT, J.

19